### In re HEALTH MANAGEMENT LIMITED PARTNERSHIP, Debtor.

No. 03–71681.

United States Bankruptcy Court, C.D. Illinois.

Dec. 10, 2003.

Sumner A. Bourne, Peoria, IL, for Debtor.

Robert M. Riffle, Peoria, IL, Neal D. Colton, Philadelphia, PA, for Personal-Care.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

The core issue presently before the Court is whether PersonalCare Insurance of Illinois, Inc. ("PersonalCare") has violated the automatic stay by failing to pay medical insurance claims of Debtor's employees for March, 2003.

On April 2, 2003, Health Management Limited Partnership ("Debtor"), doing business as, among other entities, Doctors Hospital, filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Prior to the petition date, the employees of Doctors Hospital were covered by a group medical insurance policy between Doctors Hospital and PersonalCare.

On July 15, 2003, Debtor filed a Motion for PersonalCare to Show Cause Why It Is Not Paying Medical Insurance Claims by Debtor's Employees for March, 2003 (the "Motion"). On August 8, 2003, PersonalCare filed its Response to the Motion. The Motion and Response are currently before the Court for adjudication.

A fair amount of background is necessary. Doctors Hospital was an employer group which purchased group health insurance for its employees through PersonalCare. Doctors Hospital initially fell behind in its payment obligations in October, 2002, by not paying premiums for November, 2002, on or before the due date of October 25, 2002.

On November 12, 2002, PersonalCare sent a late notice to Doctors Hospital advising Doctors Hospital that the premium for November coverage was past due, and that payment must be received no later than November 22, 2002. On November 25, 2002, PersonalCare received the delinquent November premium from Doctors Hospital. At its discretion, PersonalCare reinstated coverage for the group. Pursuant to the terms of the Group Enrollment Agreement, the December premium was due on this date as well. However, PersonalCare did not receive the December premium on this date.

On December 12, 2002, PersonalCare sent a late notice to Doctors Hospital advising Doctors Hospital that the premium for December was past due, and that payment had to be received no later than December 23, 2002, in order for the group to retain coverage. When PersonalCare did not receive the late payment by December 23, it sent a second late notice to Doctors Hospital which required the payment of the December premium within five business days to avoid termination of coverage. On December 26, 2002, PersonalCare received the late premium for the month of December.

In the meantime, the January premium had become due on December 26, 2002. PersonalCare did not receive the January premium, and sent a late notice to Doctors Hospital on January 13, 2003, advising Doctors Hospital that the premium for January was past due, and that payment had to be received no later than January 24, 2003, in order to maintain coverage. On January 28, 2003, PersonalCare sent a second late notice to Doctors Hospital indicating the need to pay the premium due for the month of January within five business days to avoid termination of coverage.

On February 5, 2003, due to continued non-payment of the January premium, PersonalCare sent a termination letter to Doctors Hospital which gave notice of the retroactive termination of coverage, effective December 31, 2002. PersonalCare did not hear anything further until February 27, when Michael Mueller, the chief financial officer of Doctors Hospital, called Todd Peterson, the chief executive officer of PersonalCare, to discuss the coverage

termination. Mueller explained that Doctors Hospital had encountered cash flow problems because it had changed billing vendors and Medicaid had slowed down payment. He indicated that they were working out problems related to the vendor change and that Doctors Hospital expected its cash flow problem to be resolved in about a week. Mueller further indicated that Doctors Hospital had just sent a check in the amount of $117,818 for past due premiums. That check, which was received on February 28, covered the delinquent January premium, but nothing more. As a result, PersonalCare reinstated Doctors Hospital's coverage for the month of January, but not for February or March.

On March 3, 2003, Mueller and James Bohl of Doctors Hospital called Todd Petersen. They explained that the billing problems had not yet been resolved, but that Doctors Hospital proposed that it be allowed to make the February and March premiums, as well as the premiums that would be due through the month of May, pursuant to a Special Payment Plan. Doctors Hospital promised that, by May, 2003, it would have fully resolved its billing problems and would be able to pay premiums as required by the Group Enrollment Agreement.

PersonalCare reluctantly agreed to the Special Payment Plan, but only on two conditions: First, the Special Payment Plan be in writing to avoid a subsequent dispute about its terms, and secondly, Mueller had to acknowledge his clear and absolute understanding that, if any payment were missed under the Special Payment Plan, termination would be immediate, retroactive to the last day for which a premium was received, and that PersonalCare could not be expected to reinstate coverage yet again. Doctors Hospital agreed to these conditions, acknowledging its obligations and its understanding of the consequences that would arise should it default under the Special Payment Plan.

On March 3, 2003, pursuant to the agreement reached telephonically between Doctors Hospital and PersonalCare, PersonalCare received a letter from Mueller detailing the Special Payment Plan. Under the Special Payment Plan, the premium for February coverage would be paid on March 14, 2003; the premium for March coverage would be paid on March 28, 2003; the premium for April coverage would be paid on April 15, 2003; and the premium for May coverage would be paid on April 30, 2003. PersonalCare accepted the Special Payment Plan by issuing a reinstatement letter to Doctors Hospital which informed it that coverage for the month ending January 31, 2003, would be reinstated without lapse.

After making the February payment, Doctors Hospital failed to pay the March premium by March 28, 2003, the due date set forth under the Special Payment Plan. When notified of the missed payment on April 1, 2003, Todd Petersen instructed the Enrollment and Billing Department of PersonalCare to immediately notify Doctors Hospital that its coverage terminated effective February 28, 2003. Although no such notice was required under the Special Payment Plan, on April 2, Steve Bragorgos, a PersonalCare marketing representative, called Michelle Bulinski of Doctors Hospital to inform her that coverage had been terminated retroactive to March 1, 2003. A letter indicating the same was also sent on April 15, 2003.

As stated above, Debtor filed its bankruptcy petition on April 2, 2003. Debtor asserts that PersonalCare terminated the group health insurance plan post-petition in violation of the automatic stay. Debtor proffers that it had certain statutory rights of reinstatement which meant that the

Debtor retained an interest in the insurance policy at the time it filed its petition in bankruptcy.

It is undisputed that the premium for March coverage was the payment due on March 28, 2003. Doctors Hospital did not make the required payment on that date and, as a result, the Court finds that, under the terms agreed to by the parties in the Special Payment Plan, coverage terminated retroactive to February 28, 2003, the last day for which a premium was timely paid.

The termination of coverage, retroactive to February 28, complied fully with applicable law and regulations. Section 30(B)(1) of the Illinois Health Insurance Portability and Accountability Act states that "[a] health insurance issuer may non-renew or discontinue health insurance coverage offered in connection with a group health plan in the small or large group market...[when] [t]he plan sponsor has failed to pay premiums or contributions in accordance with the terms of the health insurance coverage or the issuer has not received timely premium payments." 215 ILCS 97/30(B)(1).

The Illinois Administrative Code provides that a Health Maintenance Organization ("HMO") may cancel a group or individual contract or evidence of coverage when an enrollee fails to pay the amount due under the contract or evidence of coverage for which the enrollee is legally responsible. Ill. Admin. Code. *tit.* 50, § 5421.11. Further, a group HMO contract must provide for a grace period of not less than 10 days for the payment of premium. It further states that coverage will remain in effect during the grace period if payment is made during the grace period. Ill. Admin. Code *tit.* 50, § 5421.110(m). Illinois law thus makes payment of premium during the grace period an express condition of coverage remaining in effect during the grace period.

■ Termination occurred on March 28, 2003, the final day in an extended grace period under the Special Payment Plan. This occurred prior to the petition date; accordingly, Debtor has no interest in the group health insurance policy, nor any rights of reinstatement, as of the petition date. Therefore, there could be no violation of the automatic stay on the part of PersonalCare.

■ Doctors Hospital admits that it failed to pay the March premium when due—even under the Special Payment Plan. Both the coverage certificate and the Group Enrollment Agreement expressly provide that non-payment of premium within the grace period shall result in termination of coverage as of the last day of the period for which premium payments have been made. Thus, upon non-payment of the March premium on March 28, 2003, PersonalCare did not need to take any action in order for coverage to terminate as of February 28, 2003. "A provision which expressly stipulates for suspension or forfeiture upon the nonpayment of premiums is automatic, and no formal declaration of suspension or forfeiture need be made..." *In re Milgram Kagan Corp.*, 1994 WL 22470 at *3 (Bankr.N.D.Ill. Jan. 24, 1998), *quoting* 6 Mark S. Rhodes, Couch on Insurance, § 32:67, p. 340 (*citing U.S. Life Ins. Co. v. Ross*, 159 Ill. 476, 42 N.E. 859 (1896); *Glaspy v. United Brotherhood*, 163 Ill.App. 78 (1911)). The subsequent notices of termination given by PersonalCare, in the form of an April 2 telephone call and an April 15 letter, were not prerequisites to terminating coverage.

■ Neither do the coverage document provide Doctors Hospital with a basis for demanding coverage for the month of March. There are two operative coverage

documents which set forth the terms and conditions pursuant to which Personal-Care provided coverage to eligible employees or members of the group and their eligible dependents in consideration for the timely payment of premiums by Doctors Hospital—the Certificate which Doctors Hospital was obligated to provide to every member of the group, and the Group Enrollment Agreement between PersonalCare and Doctors Hospital.

Section III of the Certificate governs termination of a member's coverage. Paragraph A.1 provides that: "In the event any required premium or employee contribution for coverage is not paid within the Grace Period, Your coverage shall terminate as of the last day of the month for which the last premium was timely paid." In other words, non-payment of premium for a given individual by the end of a grace period automatically results in termination of coverage for that individual, retroactive to the last day of the month for which the last premium was timely paid. This provision is consistent with 50 Ill. Admin. Code *tit.* 50, § 5421.110(m), which states that coverage remains in effect during a grace period *if* payment is made during the grace period.

Similarly, Section VII, Paragraph A, which addresses failure to make payments, provides: "Only Members for whom the stipulated payment is actually received by PersonalCare shall be entitled to health services covered hereunder and then only for the period for which such payment is received. A Grace Period of ten (10) days will be granted for the payment of each premium falling due after the first premium, during which time this Certificate will continue in force. If payment is not made within the Grace Period, coverage under this Certificate shall terminate as of the end of the period for which premium payments have been made."

The termination of coverage for Doctors Hospital thus occurred in the manner contemplated by the Certificate. Through the Special Payment Plan, Doctors Hospital received the benefit of an extended grace period for the March premium, which became due on March 28 rather than the contract deadline of February 25. Until March 28, the Certificate remained in force. However, once payment was not made within the extended grace period, coverage under the Certificate terminated as of February 28, the end of the period for which premium payments were made.

Whereas the Certificate set forth the terms of the relationship between PersonalCare and each member of the group, the Group Enrollment Agreement governed the relationship between PersonalCare and the Group as a whole. Pursuant to Paragraph 7 of the Group Enrollment Agreement, Doctors Hospital was required to pay, by the 25th day of each month, all premiums for the following month of coverage. Payment of *all* premiums was made an express condition of PersonalCare's duties and obligations. If Doctors Hospital did not make payment *in full* of the required premiums for the Group on or prior to the premium due date, a 15–day grace period was granted to Doctors Hospital for payment under Paragraph 7. If PersonalCare did not receive payment by the expiration of the grace period, it was authorized to terminate the Group Enrollment Agreement upon written notice to Doctors Hospital, and PersonalCare was released from all coverage liability as of the last date for which premiums were paid, subject to the grace period and conditions of the applicable coverage documents.

Viewing the terms of the Certificate and the Group Enrollment Agreement as a whole, there are two conditions which must be met in order for an individual

member of a group to retain coverage. First, PersonalCare must receive a premium for that individual member on a timely basis. Second, there must be a Group Enrollment Agreement in place between PersonalCare and the group. The failure of either condition results in termination of coverage for the member, although the timing of termination would differ depending on the cause. Termination occurs retroactively in the event of non-payment of a member's premium (pursuant to Section III, Paragraph A.1 of the Certificate), but if termination of coverage is triggered by termination of the Group Enrollment Agreement, termination of coverage occurs on the effective date of termination of the Agreement (pursuant to Section III, Paragraph A.4 of the Certificate).

In the case of Doctors Hospital, PersonalCare did not receive timely payment of premium for *any* member of the group. Coverage for *each* member therefore terminated automatically as of February 28, 2003, which was the last day of the month for which the last premium was timely paid. Accordingly, the subsequent notices of termination given by PersonalCare, in the form of the April 2 telephone call from Steve Bragorgos to Michelle Bulinski and an April 15 letter from Todd Petersen to Mueller, were not prerequisites to terminating coverage.

■ The Debtor further asserts that the Illinois Insurance Code provides an additional basis to supports its Motion. Debtor contends that the acceptance by PersonalCare of the payments made by the Debtor on February 26, 2003, and March 14, 2002, resulted in the reinstatement the purportedly lapsed policy. As stated and mandated in 215 ILCS 5/357.5, "[i]f any renewal premium be not paid within the time granted the insured for payment, a subsequent acceptance of premium by the company or by any agent

duly authorized by the company to accept such premium, without requiring in connection therewith an application for reinstatement, shall reinstate the policy..." Accordingly, Debtor asserts that the acceptance by PersonalCare of the February 26th and March 14th payments reinstated the policy under the Illinois Insurance Code and, inasmuch as both of said payments were equal to one month of coverage respectively, the reinstated policy would, at the least, cover the time period of March 1, 2003, to April 15, 2003—the period that PersonalCare refuses to cover.

The reinstatement provisions of the Illinois Insurance Code do not support the Debtor's argument. The March premium was not paid by March 28, 2003, the time granted Doctors Hospital for payment. PersonalCare and its agents did not subsequently accept payment of premium by Doctors Hospital, nor did Doctors Hospital even attempt to pay the premium. Doctors Hospital did not make any payments after March 28, 2003, and PersonalCare did not receive any payments after March 28, 2003. The payments made on February 26 and March 14 each purchased one month of coverage; however, those months were January and February, not March or beyond.

■ Debtor next contends that PersonalCare violated the notice requirements of the Consolidated Omnibus Reconciliation Act ("COBRA") (29 U.S.C. § 1161 *et seq.*) by failing to notify all plan beneficiaries in writing of the termination of insurance coverage under the plan, and of the employee's right to elect continuation coverage at the employee's own expense within a 60–day grace period. 29 U.S.C. § 1166(a)(4).

Debtor's rationale for how PersonalCare's alleged failure to comply with certain provisions of COBRA constituted a violation of the automatic stay in Debtor's

bankruptcy case is unclear. It is also unimportant inasmuch as the COBRA provisions are inapplicable to the case at bar because PersonalCare was not the plan administrator for the Doctors Hospital group. The employer, Doctors Hospital, was the plan administrator. For purposes of the Employee Retirement Income Security Act ("ERISA") and COBRA, the term "administrator" means "(i) the personal specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Security may by regulation prescribe." 29 U.S.C. § 1002(16)(A). A plan sponsor is defined as the employer in the case of an employee benefit plan established or maintained by a single employer. 29 U.S.C. § 1002(16)(B). Since the plan instrument does not designate an administrator, the plan sponsor, Doctors Hospital, is also the plan administrator. AS a result, COBRA imposes no notice obligations on PersonalCare.

Debtor argues alternatively that, even if Doctors Hospital is the plan administrator, the retroactive termination of coverage prevented the employees of Doctors Hospital from exercising their right to continue coverage under COBRA. This argument also fails because the right of an employee to elect to continue coverage under the employer's group plan requires, inferentially, that the group plan itself be in effect. In this case, there was no group coverage left to continue. The provisions of COBRA have no effect on the retroactive termination of Doctor's Hospital's group coverage resulting from non-payment of premium for the month of March.

For the reasons set forth above, Debtor's Motion to Show Cause must be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.